IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

VERONICA J. PETERSON,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C13-0052

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

*I.*    *INTRODUCTION* ............................................. 2

*II.*   *PROCEDURAL BACKGROUND* ............................... 2

*III.*  *PRINCIPLES OF REVIEW* .................................. 2

*IV.*  *FACTS* ..................................................... 4
    *A.*    *Peterson's Education and Employment Background* ........... 4
    *B.*    *Administrative Hearing Testimony* ....................... 4
        *1.*    *Peterson's Testimony* ............................. 4
        *2.*    *Vocational Expert's Testimony* ..................... 6
    *C.*    *Peterson's Medical History* ............................ 7

*V.*   *CONCLUSIONS OF LAW* .................................... 18
    *A.*    *ALJ's Disability Determination* ......................... 18
    *B.*    *Objections Raised By Claimant* ......................... 21
        *1.*    *Medical Opinions* ............................... 21
            *a.*    *Dr. Larsen's Opinions* ..................... 21
            *b.*    *Stientjes' Opinions* ....................... 25
            *c.*    *Snider's Opinions* ....................... 26
        *2.*    *Credibility Determination* ........................ 29

*VI.*  *CONCLUSION* ............................................ 33

*VII.* *ORDER* .................................................. 33

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Veronica J. Peterson on May 28, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Peterson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Peterson requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On May 28, 2013, Peterson filed this action for judicial review. The Commissioner filed an Answer on January 16, 2014. On February 19, 2014, Peterson filed a brief arguing that there is no substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On April 8, 2014, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On October 30, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id*. (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id*. (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id*. at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's

3

decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Peterson's Education and Employment Background

Peterson was born in 1971. She completed the eighth grade. While in school, she took special education classes due to difficulties with comprehension, reading, and writing. She has not earned a GED. Her past relevant work consists of cashier, hand packager, painter, daycare worker, and restaurant worker.

### B. Administrative Hearing Testimony

#### 1. Peterson's Testimony

At the administrative hearing, Peterson's attorney asked Peterson to discuss her low back pain and previous back surgery. Peterson testified that she had back surgery in April 2010. She stated that the surgery fixed some of her back problems, but the pain did not go away completely. According to Peterson, at its worst, her low back pain is quite severe. She takes medication for the pain, but the medication makes her drowsy and groggy. The medication also makes thinking and concentration difficult. She indicated

that her back pain makes it "hard for me to bend, kneel, stoop, squat. If I sit too long, if I stand too long, if I lay down too long, it all hurts."[1]

Peterson's attorney also inquired about Peterson's difficulties with migraine headaches, and her treatment for them:

> Q: So you've had specific shots for the migraines?
> A: Yep.
> Q: And has it made any difference?
> A: It helps some days. It can get pretty bad to where I can't even see right. I see blurry because the pain's so severe. It takes a few days to kick in. It doesn't kick in right away.
> Q: And what is the frequency of the migraines? Are you having them -- one a week, one a month, one a --
> A: Oh, no. I pretty much get them every day.
> Q: And how do you know it's a migraine as opposed to another kind of headache?
> A: It starts in the back of my head where the nerve is and it shoots up to the front of my head.
> Q: Does it affect your vision?
> A: Yes, it does.
> Q: Does -- or -- do you get nauseated? What --
> A: No, it's [not] that kind of migraine.
> Q: Are you sensitive to light with it?
> A: Yeah.
> Q: So what's the remedy other than getting the shots? What else do you do if you get one during the day?
> A: I take [pain medication].
> Q: Does that make any difference?
> A: It takes the pain away.
> Q: So do you need to rest or sleep or anything?
> A: Sleep.

(Administrative Record at 68-69.)

---

[1] Administrative Record at 67.

Next, Peterson's attorney inquired about Peterson's mental health difficulties. Peterson testified that she was recently diagnosed with schizophrenia. She testified that she hears voices which sometimes lead to suicide attempts. According to Peterson, the voices become more pronounced when she is under stress or around large groups of people. Peterson also stated that she has been diagnosed with a personality disorder. She explained that her mood can shift rapidly from contentment to anger. She also gets panic attacks at times. She testified that she does not like to leave her home by herself. She also stated that some days she doesn't get out of bed, and her family performs all the household chores. Lastly, Peterson testified that she believes her medication helps control her symptoms.

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is:

> limited to light work. That is, lift and/or carry occasionally 20 pounds, frequently 10 pounds, stand and or walk for a total of at least six hours out of an eight hour workday, sit about six hours out of an eight hour workday, occasionally climbing ramps, stairs, stooping, kneeling, balancing, crouching, crawling, never climbing ladders, ropes, scaffolds. Avoid concentrated exposure to hazards, machinery, heights, only occasional contact with coworkers or supervisors [or] public. Abel [(sic)] to do only simple, routine, repetitive work.

(Administrative Record at 92.) The vocational expert testified that under such limitations, Peterson could not return to her past relevant work, but could perform the following jobs: (1) mail clerk (700 positions in Iowa and 64,000 positions in the nation), (2) photocopy machine operator (250 positions in Iowa and 29,000 positions in the nation), (3) laundry folder (800 positions in Iowa and 95,000 positions in the nation). The ALJ asked a second hypothetical limiting the individual to:

> sedentary work. It's occasionally climbing ramps, stairs,
> stooping, kneeling, balancing, crouching, crawling, never
> climbing ladders, ropes, scaffolds.  Avoid concentrated
> exposure to hazards, machinery, height[s].  No more than
> working at a regular pace, only occasional contact with
> coworkers or supervisors. . . .  No close attention to [] detail,
> able to do only simple, routine, repetitive work.  Time off
> tasks can be accommodated by normal breaks.

(Administrative Record at 93-94.)  The vocational expert testified that under such limitations, Peterson could perform the following work:  (1) document preparer (1,300 positions in Iowa and 119,000 positions in the nation), (2) addresser (200 positions in Iowa and 18,000 positions in the nation), and (3) ticket counter (800 positions in Iowa and 72,000 positions in the nation).  Finally, the ALJ asked the vocational expert a third hypothetical which was identical to the second hypothetical, except that the individual would be limited to a slow pace for one-third of the workday.  According to the vocational expert, under such limitations, Peterson would be precluded from competitive employment.

### C.  Peterson's Medical History

On June 17, 2004, Peterson met with Dr. Ali Safdar, M.D., at the Abbe Center for Community Mental Health in Cedar Rapids, Iowa.  Her chief complaint was mood swings, irritability, and "not functioning well."  In reviewing Peterson's medical records, Dr. Safdar noted that Peterson reported similar problems since age 12.  Dr. Safdar further noted that:

> She said that she had a lot of problems in her childhood.  She
> said that she had a real bad temper and has had lots of highs
> and lows.  She reported that she has seen a lot of doctors, has
> been hospitalized several times, and attempted suicide several
> times -- the last being in January of 2004 by hanging. . . .  She
> reports that her husband has been concerned about her anger
> problems and [has] been encouraging her to seek some help.

7

(Administrative Record at 606.) Dr. Safdar also indicated that Peterson had been seen at the Abbe Center in 2001 and 2002 for major depressive disorder. According to Peterson, her mood swings from high to low. When she is low, her symptoms include feeling down, feeling sad, having no energy, lacking motivation, and just wanting "to stay in bed and not be bothered."[2] When her mood is high, her symptoms include high energy, decreased need for sleep, irritability, racing thoughts, and compulsive cleaning. Upon examination, Dr. Safdar diagnosed Peterson with bipolar disorder and history of ADHD. Dr. Safdar recommended medication as treatment.

On April 27, 2006, Peterson returned to the Abbe Center on her third new admission. She presented with depression, feeling paranoid, and hearing voices. Dr. Safdar noted that Peterson reported "experiencing paranoid feelings and voices for a number of years but she never shared this with anyone before except her husband. She reports she took a drug overdose in March and was at Mercy for a few days and was referred for outpatient follow-up here."[3] In assessing her mental status, Dr. Safdar noted that:

> [Peterson s]tates she has been on a "roller coaster." Says she breaks down and won't cry. States sometimes she will sleep all day long. She reports being moody, irritable and going through a lot of ups and downs. She stated she would be raking leaves at 10 PM. She reports some racing thoughts and getting distracted rather easily and not very focused or organized.

(Administrative Record at 612.) With regard to hearing voices, Peterson stated that she hears a man talking to her, and also hears a woman talking about what the man was saying

---

[2] Administrative Record at 607.

[3] Administrative Record at 611.

to her. She indicated that she "feels like others are conspiring against her."[4] Upon examination, Dr. Safdar diagnosed Peterson with bipolar affective disorder, most recent episode depressed with psychotic features. Dr. Safdar recommended medication as treatment.

On March 30, 2007, Peterson was urged by her husband and children to return to the Abbe Center for her fourth admission. At the Abbe Center, she met with Sinda Eggerman, Ph.D., a licensed psychologist. She reported feeling depressed and discouraged. She also reported difficulties sleeping, loss of energy, and anxiety. Her symptoms included having a short attention span, being distractable and forgetful, having poor concentration, and being disorganized. Dr. Eggerman noted that Peterson "is working below capacity. She fails to complete tasks. She procrastinates."[5] Upon examination, Dr. Eggerman diagnosed Peterson with bipolar disorder. Dr. Eggerman recommended therapy as treatment, but opined that Peterson "does not seem to be motivated for treatment. She has no clear goals."[6]

On June 13, 2007, Dr. Jane Bibber, Ph.D., reviewed Peterson's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Peterson. On the Psychiatric Review Technique assessment, Dr. Bibber diagnosed Peterson with bipolar syndrome. Dr. Bibber determined that Peterson had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Bibber determined that Peterson was moderately

---

[4] *Id.* at 612.

[5] *Id.* at 617.

[6] Administrative Record at 618.

limited in her ability to: carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently of others. Dr. Bibber concluded that:

> [Peterson] is able to understand and remember simple instructions. She can concentrate adequately to carry out such instructions in a moderately paced work setting. She is able to interact appropriately with supervisors and co-workers on a superficial level, with only occasional difficulty. She can respond appropriately to changes in the work place. In brief, [she] is mentally capable of engaging in simple competitive employment.

(Administrative Record at 625.)

On September 2, 2008, Peterson met with Julie K. Shaw, ARNP, complaining of headaches. Shaw noted that Peterson had a history of migraine headaches since she was in high school. Her migraines tended to be severe and occurred once or twice per month. Shaw further noted that recently, Peterson's headaches were worse and occurred "nearly" daily. Peterson described her headaches as being "there when she awakens in the morning. No significant aura, but she is light sensitive, sound sensitive, [and] will occasionally get nauseated. Headaches usually start at the back of her head and work its

way up and can either be unilateral or bilateral."[7] Upon examination, Shaw diagnosed Peterson with common migraine, non-refractory, and chronic daily headaches with evidence of medication over-use. Shaw recommended a preventative medication as treatment.

On February 17, 2009, DDS referred Peterson to Dr. Harlan J. Stientjes, Ph.D., for a psychological evaluation. In reviewing her medical history, Dr. Stientjes noted that:

> [Peterson has] multiple hospitalizations for psychiatric difficulties. She was diagnosed with ADHD as a child and said she had considerable contact with psychiatrists during her childhood. She has also been identified with BiPolar Disorder with a reported good response to lithium medication, although it is no longer recommended for her secondary to kidney issues. Current medications include Prozac and Lamictal. There are some concerns about failure to be compliant with her medication regimen.

(Administrative Record at 840-841.) Upon examination, Dr. Stientjes diagnosed Peterson with bipolar disorder and borderline personality disorder traits. Dr. Stientjes opined that Peterson would have the following work limitations:

> [Peterson] can understand and remember simple oral instructions. She can carry out well-mastered routines from one day to the next. Her major difficulty with work appears to be that depressive symptoms and impulsivity impinge on interactions with supervisors and coworkers. She has reportedly been fired from most jobs she has held, us[ually] lasting less than six months. Safety judgment would be considered mildly impaired based upon inattentiveness and impulsivity. Response to workplace changes will require far more than typical supportive supervision and tolerance of difficulties with others. For the most part, she will need to work in isolation. She also needs to become more compliant with medication regimen to help control various symptoms.

---

[7] Administrative Record at 1026.

(Administrative Record at 842.) Dr. Stientjes concluded that:

> There is consistent difficulty with noncompliance with medication, somewhat as a manifestation of the disorder, including both delusional paranoia, during depressive phases, and grandiosity about the ability to handle anything during manic episodes. Work history is very marginal and prospects for sustained gainful employment are guarded, based upon history.

(Administrative Record at 842.)

On March 4, 2009, Dr. Scott Shafer, Ph.D., reviewed Peterson's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Peterson. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Peterson with bipolar affective disorder, generalized anxiety disorder, PTSD, and borderline personality disorder. Dr. Shafer determined that Peterson had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Shafer determined that Peterson was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately in changes to the work setting. Dr. Shafer concluded that:

> [Peterson] retains the ability to understand, remember, and follow simple oral instructions. Her attention, concentration, and pace may vary, but are adequate for simple tasks. She can interact appropriately with coworkers and supervisors on a

> very limited basis. Her judgment is adequate to adjust to
> changes in the workplace with support.

(Administrative Record at 859.)

On March 24, 2009, Peterson met with Dr. Robert J. Schultes, M.D., for a consultative disability examination. Peterson told Dr. Schultes that she was unable to work for the following reasons: (1) depression since age 12, (2) multiple hospitalizations for suicide attempts, (3) arthritis in her hips which makes standing and sitting difficult, and (4) low back pain. Upon examination, Dr. Schultes diagnosed Peterson with a history of chronic and acute depression, osteoarthritis of the hip, and history of low back pain, status post back surgery. Dr. Schultes indicated that Peterson could: lift and carry 25 pounds, sit and move about for 4 hours in an 8-hour workday, walk for one-half hour in an 8-hour workday, and sit for 2 hours in an 8-hour workday.[8]

On April 19, 2009, Dr. C. David Smith, M.D., reviewed Peterson's medical records and provided DDS with a physical RFC assessment for Peterson. Dr. Smith determined that Peterson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Smith also determined that Peterson could occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. Dr. Smith opined that Peterson should avoid

---

[8] It is unclear from the record whether Dr. Schultes' opinions regarding Peterson's functional limitations are based upon his examination of Peterson, or based on her statements about her functional limitations to him. *Compare* Administrative Record at 865 (providing that Peterson "states" she can perform certain activities) and Administrative Record at 869 (handwritten notes accompanying range of motion notes regarding Peterson's functional abilities).

concentrated exposure to hazards, such as heights and machinery. Dr. Smith found no manipulative, visual, or communicative limitations.

On December 30, 2009, Peterson met with Dr. James M. Pape, M.D., regarding significant low back pain. Dr. Pape noted that Peterson had been dealing with low back pain for the past 6 months. She reported that "all activities seem to be painful and her discomfort seems to be relieved by changing position but her relief is only slight. [She] notes pain with sitting, standing, walking, and lying."[9] Dr. Pape noted that Peterson had recently received 3 epidural injections without long lasting relief. An MRI also showed "significant" degenerative changes at the L5-S1 level. Upon examination, Dr. Pape concluded that Peterson's "low back complaints are most consistent with a degenerative L5-S1 disk space with mechanical pain."[10] Dr. Pape recommended physical therapy and low back strengthening as treatment. However, if such treatment was not successful, Dr. Pape recommended surgery as an option. Peterson eventually had back surgery in April 2010.[11]

On March 9, 2010, Peterson was referred to Dr. Stientjes for a second psychological evaluation. Upon examination, Dr. Stientjes diagnosed Peterson with borderline personality disorder. Dr. Stientjes opined that "[t]here is a prior diagnosis of BiPolar Disorder; however, the primary diagnosis may more appropriately be Borderline Personality Disorder as there is a long history of difficulty getting along with others,

---

[9] Administrative Record at 1030.

[10] *Id.* at 1031.

[11] *Id.* at 1096.

unstable relationships and other features of Borderline Personality Disorder."[12] With regard to work limitations, Dr. Stientjes determined that:

> [Peterson] is inattentive to oral and written instructions. Carryover from one day to the next likely will require external structure and motivation. There is a significant history of problems getting along with coworkers, with regular verbal confrontations and occasional physical aggressiveness. Safety judgment is likely comparatively poor due to impulsivity. Response to workplace changes will require individual attention.

(Administrative Record at 1040-1041.) Dr. Stientjes concluded that "[p]rospects for sustained gainful employment are comparatively poor."[13]

On March 18, 2010, Dr. Dee Wright, Ph.D., reviewed Peterson's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Peterson. On the Psychiatric Review Technique assessment, Dr. Wright diagnosed Peterson with bipolar affective disorder, generalized anxiety disorder, PTSD, and borderline personality disorder. Dr. Wright determined that Peterson had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Wright determined that Peterson was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and

---

[12] Administrative Record at 1041.

[13] *Id.*

length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately in changes to the work setting. Dr. Wright opined that Peterson is "able to sustain sufficient concentration and attention to perform a range of simple, repetitive, and routine cognitive activities when she perceives [it is] in her interest to do so."[14] Dr. Wright further opined that "in a low stress and predictable environment [Peterson] can sustain short-lived, superficial interaction with others in appropriate ways when she perceives it to be in her interest to do so."[15] Dr. Wright concluded that:

> In reviewing the medical evidence of record, [Peterson] has been inconsistent at times in reporting the frequency and seriousness of her symptoms. In addition, [she] has been noncompliant with prescribed treatment at times and, more recently, has not been actively involved in ongoing psychological treatment/therapy despite her allegations. These facts do erode [her] credibility. Despite [her] inconsistencies, the preponderance of the objective medical evidence of record reviewed is consistent and does support [Peterson's] limitations of function as discussed in this review.

(Administrative Record at 1095.)

On June 28, 2010, Mark E. Snider, ARNP, provided a letter to DDS outlining Peterson's limitations. It appears from the record that Snider provided medical checks for Peterson as part of outpatient behavioral health services at St. Luke's Hospital in Cedar Rapids, Iowa. Snider's letter offers no details regarding Snider's medical history, treatment history, diagnoses, or explanation of her limitations. Instead, Snider's letter simply states:

---

[14] Administrative Record at 1095.

[15] *Id.*

1. Remember & Understand Instructions, Procedures & Locations: Limited.
2. Carry out Instructions, Maintain Attention, Concentration & Pace: Limited.
3. Interact appropriately with supervisors, co-workers & the public: Limited.
4. Use good judgment & respond appropriately to changes in the work place: Impaired.
5. Is this person capable of handling benefits on her own behalf: Yes.

(Administrative Record at 1133.)

On July 1, 2010, Dr. Jan Hunter, D.O., reviewed Peterson's medical records and provided DDS with a physical RFC assessment for Peterson. Dr. Hunter determined that Peterson could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Hunter also determined that Peterson could occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. Dr. Hunter found no manipulative, visual, communicative, or environmental limitations.

On October 17, 2011, at the request of Peterson's attorney, Dr. Rick Larsen, a "treating specialist," filled out a "Mental Impairment Questionnaire" for Peterson. Dr. Larsen diagnosed Peterson with schizophrenia. Dr. Larsen opined that Peterson's prognosis was guarded, but noted that she was improving with appropriate medication and support. Dr. Larsen found that Peterson had "no useful ability to function" in the following areas: understanding and remembering very short and simple instructions, carrying out very short and simple instructions, maintaining attention for two-hour segments, maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination or

proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, interacting appropriately with the general public, maintaining socially acceptable behavior, and using public transportation. Dr. Larsen determined that Peterson had the following limitations: marked restriction of activities of daily living, no difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Lastly, Dr. Larsen opined that Peterson would miss four or more days of work per month due to her impairments or treatment for her impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Peterson is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir.

2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Peterson engaged in substantial gainful activity in May 2009 through February 2010. The ALJ also determined that Peterson's disability onset date was June 15, 2007 because a previous application for benefits was denied on June 14, 2007, and Peterson did not appeal that denial of benefits. Thus, for purposes of Peterson's instant application for disability benefits, the ALJ's decision provides that she did not engage in substantial gainful activity since June 14, 2007, except for the period of May 2009 to February 2010, when she worked at a Mexican restaurant.[16] At the second step, the ALJ concluded from the medical evidence that Peterson has the following severe impairments: degenerative disc disease of the lumbar spine, mild bilateral hip osteoarthritis, bipolar affective disorder versus schizophrenia, generalized anxiety disorder, PTSD by history, and borderline personality disorder. At the third step, the ALJ found that Peterson did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Peterson's RFC as follows:

> [Peterson] has the residual functional capacity to perform sedentary work . . . except she may only occasionally climb ramps and stairs, stoop, kneel, balance, crouch, or crawl. She cannot climb ladders, ropes, or scaffolding, must avoid concentrated exposure to hazards, machinery, or heights, and cannot work at more than a regular pace. [She] may have only

---

[16] *See* Administrative Record at 33; 35.

occasional contact with coworkers or supervisors, cannot pay close attention to detail, and is limited to simple, routine, repetitive work. Her time off task can be accommodated by normal breaks.

(Administrative Record at 37.) Also at the fourth step, the ALJ determined that Peterson was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Peterson could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Peterson was not disabled.

## B. Objections Raised By Claimant

Peterson argues that the ALJ erred in two respects. First, Peterson argues that the ALJ failed to properly consider the opinions of her "treating specialist," Dr. Larsen, an examining consultative psychologist, Dr. Stientjes, and a treating nurse practitioner, Mark Snider. Second, Peterson argues that the ALJ failed to properly evaluate her subjective allegations of disability.

### 1. Medical Opinions

#### a. Dr. Larsen's Opinions

Peterson argues that the ALJ failed to properly evaluate the opinions of her "treating specialist," Dr. Larsen.[17] Specifically, Peterson argues that the ALJ's reasons for

---

[17] In his opinion, the ALJ describes Dr. Larsen as Peterson's "psychiatrist." The ALJ offers no opinion on whether Dr. Larsen is a treating or non-treating source, but the Commissioner questions whether Peterson's description of Dr. Larsen as a "treating specialist" is proper. The Commissioner points out that when he filled out the "Mental Impairment Questionnaire," Dr. Larsen had only treated Peterson for less than three months. The Court, like the Commissioner, is skeptical of Dr. Larsen's designation as a "treating specialist." Peterson responds that Dr. Larsen treated her when she was hospitalized in July 2011 and supervised Mark Snider, a nurse practitioner, who treated her multiple times between 2008 and 2010. While skeptical of Dr. Larsen's designation
(continued...)

discounting Dr. Larsen's opinions are not supported by substantial evidence in the record. Peterson concludes that this matter should be reversed and remanded to allow the ALJ to properly evaluate Dr. Larsen's opinions.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical

---

[17](...continued)
as a treating source, the Commissioner, nevertheless, addresses Dr. Larsen's opinions using the framework for treating sources. Therefore, the Court, while also skeptical, will also consider Dr. Larsen's opinions using the legal framework for a treating source. However, in doing so, the Court bears in mind that the length of the treatment relationship is a factor to be considered in weighing the opinions of a treating source. *See* 20 C.F.R. § 404.1527(c)(2)(I) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); *see also Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (applying the length of treatment factor to the opinions of a treating source who had only met with the claimant 3 times prior to rendering her opinions on the claimant's functional abilities).

assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In his decision, the ALJ provided a thorough review of Peterson's overall medical history, including her lengthy treatment for mental health issues.[18] For example, the ALJ summarized Peterson's overall mental health history, which implicitly included Dr. Larsen's treatment, as follows:

> the treatment [Peterson] has received is marked by large gaps and noncompliance. Moreover, when [she] sought medication management on a consistent basis, it appears she became able to resume substantial gainful activity. Furthermore, [Peterson] never underwent therapy for her symptoms--she merely relied on the prescriptions with which she only sporadically

---

[18] *See* Administrative Record at 39-43.

23

complied. Taken together, these factors suggest [Peterson's] symptoms associated with her mental impairments are not as severe as alleged when compliant with treatment.

(Administrative Record at 40.) Next, the ALJ specifically addressed Dr. Larsen's opinions as follows:

> The undersigned acknowledges the opinion rendered by [Peterson's] psychiatrist, Rick Larsen, M.D. While appreciative of his input, the undersigned finds a number of factors detract from the weight of his opinions. First, Dr. Larsen offered his opinions after having known [Peterson] less than three months. In fact, the undersigned could not even find a treatment record wherein Dr. Larsen directly interacted with [Peterson]. The only records referencing his name indicated his clinic's nurse practitioner met with [Peterson] and he merely reviewed [her] outpatient follow-up records in August 2011. This greatly diminishes the weight given to his opinion. Second, Dr. Larsen's opinion consists of a form questionnaire. As courts have long recognized, form reports in which the source's only obligation is to fill in a blank or check off a box are entitled to little weight in the adjudicative process. . . . While these forms are admissible, they are entitled to little weight and do not constitute "substantial evidence" on the record as a whole.

(Administrative Record at 42-43.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Larsen. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Larsen's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### b.    *Stientjes' Opinions*

Peterson argues that the ALJ failed to properly evaluate the opinions of her examining psychologist, Dr. Stientjes.    Specifically, Peterson argues that the ALJ's reasons for discounting Dr. Stientjes' opinions are not supported by substantial evidence on the record.    Peterson concludes that this matter should be reversed and remanded to allow the ALJ to properly evaluate Dr. Stientjes' opinions.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion:    "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)).    "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

In reviewing Peterson's medical history, the ALJ noted an inconsistency between Dr. Stientjes' opinion that Peterson would not interact well with co-workers, and her functional reports in the record which indicated that she could shop for food and clothes in stores and was able to work at substantial gainful activity levels during the time period she alleged she was disabled.[19]    The ALJ concluded that "[s]uch activities suggest she retains at least some level of social functioning."[20]    Similarly, the ALJ noted that Dr. Stientjes' opinions with regard to Peterson's limitations in concentration and pace were

---

[19] *See* Administrative Record at 40-41.

[20] *Id*. at 41.

inconsistent with her ability to perform substantial gainful employment for 9 months, despite her impairments.[21] Furthermore, in weighing Dr. Stientjes' opinions, the ALJ stated:

> The undersigned also gives little weight to Dr. Stientjes's opinion. He opined [Peterson's] prospects for sustained, gainful employment were poor in his most recent examination, but he failed to consider [her] substantial gainful activity as a waitress just a few months earlier. Moreover, this opinion contradicts his earlier assessment that [Peterson] would be suited for unskilled work of an isolated nature. Considering his inconsistency and no consideration of [Peterson's] recent work, the undersigned gives Dr. Stientjes['] opinion little weight.

(Administrative Record at 43.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Stientjes. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Stientjes' opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

    *c.   Snider's Opinions*

Peterson argues that the ALJ erred by not explicitly addressing Snider's opinions from a letter dated June 28, 2010. Specifically, Peterson asserts that "[t]he ALJ failed to mention or discuss this letter and implicitly rejected Mr. Snider's opinions without an

---

[21] Administrative Record at 41.

articulated basis."[22] Peterson maintains that this matter should be remanded to allow the ALJ to address Snider's opinions. In response, the Commissioner contends that:

> Although the ALJ did not explicitly mention this letter in his decision, an ALJ's choice not to cite to a piece of evidence does not indicate that the evidence was not considered. . . . And, although [Peterson] contends that the ALJ implicitly rejected Mr. Snider's letter, the ALJ's RFC findings--which included limitations in pace of work, attention to detail, and interactions with others--were largely consistent with Mr. Snider's rather vague opinion. . . . Thus, [Peterson] has established no error in the ALJ's consideration of the opinion evidence that would require remand for further consideration.

Commissioner's Brief (docket number 14) at 16-17. The Court agrees with the Commissioner.

In considering the ALJ's decision not to address Snider's letter regarding Peterson's functional limitations, the Court bears in mind that "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (citing *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993)). Failure to cite specific evidence does not indicate that the evidence was not considered by the ALJ. *Id.* (citing *Montgomery v. Chater*, 69 F.3d 273, 275 (8th Cir. 1995)).

The Court also considers that the ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting

---

[22] Peterson's Brief (docket number 13) at 24.

*Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Here, there is evidence implicit in the record that the ALJ considered Snider's opinions, as he acknowledged Snider in weighing Dr. Larsen's opinions.[23] Furthermore, Snider's letter offers no explanation or support from treatment records for the limitations he placed on Peterson. Similarly, Snider also fails to define or discuss the meaning or level of limitation he placed on Peterson's functional abilities.[24] Moreover, as the Commissioner points out, in his RFC, the ALJ included limitations in pace of work,

---

[23] *See* Administrative Record at 43 (ALJ mentions Snider in discussing Dr. Larsen's opinions).

[24] *Id.* at 1133 (Snider's vague and imprecise letter simply stating that Peterson is "limited" in certain areas).

attention to detail, and interactions with others, which appears to be consistent with Snider's vague and undefined statements of limitation. Lastly, the Court finds that overall, the ALJ in his decision, thoroughly reviewed Peterson's medical history, including her lengthy treatment for mental health issues.[25]

Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Peterson's medical records, and observations of treating physicians and other sources, both explicitly and implicitly, in making the ALJ's RFC assessment for Peterson.[26] *See Lacroix*, 465 F.3d at 887. Specifically, with regard to Snider, even though the ALJ did not explicitly address Snider's opinions, there is evidence implicit in the record that the ALJ considered such opinions in making his RFC and disability determination for Peterson. *See Black*, 143 F.3d at 386 (failure to cite specific evidence does not indicate that the evidence was not considered by the ALJ). Thus, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. Accordingly, Peterson's argument that the ALJ erred by not explicitly addressing Snider's opinions is without merit.

### 2. *Credibility Determination*

Peterson argues that the ALJ failed to properly evaluate her subjective allegations of disability. Peterson maintains that the ALJ's credibility determination is not supported

---

[25] Administrative Record at 39-43.

[26] *See id.* (providing thorough discussion of the relevant evidence for making a proper RFC determination).

by substantial evidence. The Commissioner argues that the ALJ properly considered Peterson's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*,

353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In his decision, the ALJ generally determined that:

> After careful consideration of the evidence, the undersigned finds that [Peterson's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Administrative Record at 38.) Specifically, after reviewing her medical history, the ALJ determined that:

> the treatment [Peterson] has received is marked by large gaps and noncompliance. Moreover, when [she] sought medication management on a consistent basis, it appears she became able to resume substantial gainful activity. Furthermore, [she] never underwent therapy for her symptoms--she merely relied on the prescriptions with which she only sporadically complied. Taken together, these factors suggest [Peterson's]

31

> symptoms associated with her mental impairments are not as
> severe as alleged when compliant with treatment.

(Administrative Record at 40.) The ALJ also reviewed Peterson's activities of daily living and determined that her abilities with regard to social functioning, concentration, persistence, and pace were inconsistent with her allegations of disability.[27]   The ALJ concluded that "[o]verall, [Peterson's] credibility regarding the extent of her symptoms erodes due to her chronic noncompliance, sporadic treatment, and exhibited improvement when properly treated."[28]

It is clear from the ALJ's decision that he thoroughly considered and discussed Peterson's treatment history, medical history, functional abilities, effectiveness of medications, employment history, and activities of daily living in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Peterson's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Peterson's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148.   Even if inconsistent

---

[27] *See* Administrative Record at 40-41 (providing a thorough analysis of Peterson's activities of daily living, social functioning, and work abilities).

[28] *Id.* at 42.

conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## *VI. CONCLUSION*

The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Peterson's "treating specialist," Dr. Larsen; examining psychologist, Dr. Stientjes; and nurse practitioner Mark E. Snider. The Court also finds that the ALJ properly determined Peterson's credibility with regard to her subjective allegations of disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

1.  The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.  Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3.  The Clerk of Court is directed to enter judgment accordingly.

DATED this 30th day of July, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA